Kankakee & Seneca R. R. Co. v. Horan.

# The Kankakee & Seneca Railroad Company et al.
## v.
# Frank Horan.

*Railroads—Obstruction to Flow of Surface Water—Action by Tenant for Damages—Evidence—Instructions—Practice—Denial of Motion to Grant Appeal to the Supreme Court.*

1. In an action brought by a tenant against two railroad companies to recover damages for flooding the premises occupied by him, it is *held:* That the circumstantial evidence was sufficient to warrant the jury in finding that the defendant company, which now operates the road, was its original proprietor and builder and is liable for damages resulting from its construction; that the bill filed by said company in the United States Circuit Court to enjoin this suit was properly admitted in evidence; that whether the damages were caused by the railroad embankment, was a question for the jury; that their verdict should not be disturbed even if, in the opinion of this court, it had not adjusted the loss with exactitude; that there was no substantial error in giving and refusing instructions, nor in the admission and exclusion of evidence; that an instruction, giving certain evidence special prominence, though erroneous, is not a sufficient ground for reversal; that it was not the duty of the plaintiff to mitigate the injury by digging a ditch to drain off the water; that the plaintiff as tenant was entitled to recover for the entire damages; that the evidence does not show such extraordinary and unexpected floods as would entitle them to be called acts of Providence; and that it was not error to receive the verdict on Sunday.

2. The fact that a railroad company has procured a right of way does not authorize it so to construct its road as to flood the lands of one over whose premises such right of way is granted. Reasonable care in construction is insufficient to excuse it, if by its structures it causes the land to be overflowed.

## [Opinion filed June 9, 1887.]

Appeal from the Circuit Court of Grundy County; the Hon. George W. Stipp, Judge, presiding.

This is the same case that was here at the May term, 1885, and at that time the judgment was reversed and the cause remanded for a new trial for reasons stated in that opinion, 17 Ill. App. 650. [See also, K. & S. R. R. Co. v. Horan, 22 Ill. App. 145.]

The appellee is the tenant of his father, Owen Horan, and sues to recover damages for injury to his crops, and possession of the premises which he occupied as the tenant of his father, on the account of the appellants' wrongfully turning a stream of water onto a portion of his possession by means of a railroad embankment, which it is alleged the appellants constructed across his premises and failed to make the necessary waterways through it, and by means of ditches along the sides of the railroad track constructed in such manner as to divert the water from what is called Parker slough or run and cast it onto the appellee's land.

The claim was for damages done to crops during the years 1881, 1882 and 1883. The suit was tried by a jury who found a verdict in favor of appellee for $700, on which judgment was rendered against the appellants.

The Kankakee & Seneca Railroad Company was organized under the general statute and commenced its existence February 1, 1881, and was to continue fifty years, with a capital stock of $10,000, and was to construct a railroad from Kankakee, Illinois, to Seneca, Illinois, principal business office in Kankakee. The road in question was built and commenced operations during the year 1881. Owen Horan was the owner of three eighty-acre tracts of land lying side by side in Braceville Town, in the County of Grundy, through which the railroad and embankments were constructed. The road enters near the center of the north line of the north forty of the west eighty and emerges near the center of the east line of the south forty of the east eighty-acre tract, thus cutting the tract diagonally from northwest to the southeast.

One Lyman Hawley owns an eighty-acre tract lying immediately east of the said Horan tract, and Bertrand D. Parker owns an eighty-acre tract abutting on the south end of the Hawley eighty and cornering with the southeast corner of the Horan 240-acre tract, and there are two other eighties lying west of Parker's and south of Horan's.

The railroad after it leaves Horan's land runs diagonally through Hawley's south forty, and emerging a short distance from its southeast corner on the south line, cutting off a

small portion of the northeast corner of Parker's north forty.

There was a large slough some seven or eight or more miles in length, coming from a northwest direction, entering Parker's eighty-acre tract somewhere near its southwest corner and running diagonally through the Parker eighty to near the east line of the north forty, about forty rods from the northeast corner of said northeast forty, which then turns and runs nearly due north close to said east line to the northeast corner, where the railroad crosses it, and where the railroad company left an opening under the track, the track resting on piles placed at different distances of about seventy feet or more. The slough then runs in a westerly course through Hawley's eighty and enters the east line of Horan's northeast forty about thirty rods from the northeast corner, and runs around in a curve and comes out at the north line near the northeast corner, cutting off a small portion of his land from the main body which lies east of the slough. The slough then runs off northerly and empties into Mazon Creek. There is another slough called the Whitamore slough, of lesser size, of two or three miles in length, which comes up through the eighty lying immediately south of Horan's east eighty from the south, and enters Horan's southeast forty on its south line about thirty rods west of the southeast corner of said forty, and runs diagonally through said forty in a northeasterly direction from that point to a point on the east line of the forty about the center line of the forty, and runs over into Horan's and Hawley's lands, and finally makes its way north into the Parker slough, at the point on the east line of the southeast forty of Horan's land where the railroad track crosses the slough, and also the line where the company left another opening of trestle similar to the other, of about forty-five feet in length, and for water passage of fourteen feet, the water passage at the other trestle being about nineteen feet.

It is claimed that it was the water coming from the south down through these two sloughs in wet times that caused the overflow of appellee's farming land lying south of the railroad; that the openings spoken of were not sufficient to carry off the water as fast as it came, and that by means of the rail-

road ditch on the south of the line the water was diverted from its natural course from those sloughs and carried west and cast on his lands, by means of which he lost his crops in 1881, 1882 and 1883, by which he was damaged to a large amount.

The railroad company claims that the waterways left by the railroad company were ample to and did pass the water through as well as it passed before the embankment was constructed, and that appellee's damages were not chargeable to them, and other minor claims which will be stated and noticed in the opinion. It is claimed, for another thing, that ditches had been dug into the Parker slough, to the southwardly; miles in extent, that increased the flow of water, and that this caused the increase in the flow of water, and not the construction of the railroad bank, and that the floods were so extraordinary that even if the company's banks caused the overflow they are not liable, for the reason that such floods and damages accruing should be regarded as the act and visitation of God, and not that of appellants.

Mr. G. S. ELDREDGE, for appellants.

Mr. S. C. STOUGH, for appellee.

LACEY, J. Almost immediately after the completion of the railroad, the appellant, the Cincinnati, Indianapolis, St. Louis & Chicago Railroad Company, admittedly took possession of the railroad, and has operated it from that time to this. It is substantially argued by both the appellants and appellee that both companies would be liable from the time the latter named company commenced operating the road, for all damages that might be done to appellee's crops by reason of insufficient embankments and openings, causing the water to flow into appellee's land. In other words, that both would be liable for damages caused by maintaining the nuisance. On the other hand, if the so-called Cincinnati Company had no share or did not participate in the construction of the railroad, then it would not, in any event, be liable for damages caused by

the first act of construction, and it follows would not be liable for the loss of appellee's crop of corn in the fall of 1881, before the Cincinnati Company took possession. The appellee recognizes this principle of the law in his fourteenth given instruction, and the appellants in their given eighteenth instruction. The appellants, in the last named instruction, after reciting that in the event the Cincinnati Company " were in no manner implicated in the original construction of the road, it can not be made liable in this action for the creation of any permanent structure, ditches, culverts or artificial work done by the Kankakee & Seneca Railroad Company in the original construction of said road, injuriously affecting the value of plaintiff's crop; but the Cincinnati, Indianapolis, St. Louis & Chicago Railway Company can only, in such case, be liable for any damages resulting to the plaintiff's crops from the time that the evidence shows it commenced operating said road, to the time of the commencement of this suit."

It is insisted by the attorney for appellants that there is a failure on the part of the appellee to produce any evidence showing, or tending to show, that the Cincinnati Company had anything to do with, or was in any way implicated in the building of the Kankakee & Seneca Railroad, and hence the former company is not liable for any damages done to appellee by reason of the building of the railroad originally.

In this we think there is a misapprehension of what the record shows. It is true there is no direct and positive evidence to that effect, but circumstantial evidence from which the jury might reasonably find that the Cincinnati Company was the moving spirit in the building the railroad mentioned.

The proposed branch connected with the road already operated by the Cincinnati Company, running from Cincinnati to Chicago via Indianapolis, and this new section of road, made important connection with that company's road. The Kankakee road was organized in February, 1881. Building operations commenced on it immediately and it was almost completed during the summer and fall of 1881, and trains ran on it, commencing December 24, 1881, and it was finally completed in May, 1882. The Cincinnati Company commenced to run and control it from that time.

As organized, the company had a capital stock of only $10,000 to build some forty miles of road costing several hundred thousand dollars. Most of the Kankakee & Seneca Company's officers and men actively engaged in building it were officers of the Cincinnati Company, or closely connected with it. The treasurer of the Cincinnati Company was at the same time the acting treasurer (if it had any treasurer) of the Kankakee & Seneca Railroad Company and resided in Cincinnati. He furnished all the money, and all the accounts were rendered to him and all the money received from the traffic on the road, under the management of Smith, the superintendent of the Kankakee & Seneca Railroad, sent to him. Smith was under his supervision. Bonfield, the president, seemed to have little to do with it. The road master, P. J. Kelley, having charge of laying the track, commenced acting in July, 1881. He was employed by the superintendent, Smith, and was at the same time road master of the western division of the Cincinnati Road; and Smith acted as paymaster a portion of the time and paid the men on the line of the Kankakee & Seneca Railroad from a pay car marked with the initials of the Cincinnati Company. Smith was the superintendent for about eleven months, before that being superintendent of the Martensburg branch of the Cincinnati Company's road, and when he quit the employment of the Kankakee & Seneca Road went back into the employment of the Cincinnati Company, if indeed he was not in its employ all the time. He himself swears that he went into the employ of the Kankakee & Seneca Railroad Company to help build it. Smith sent all his remittances to Osborn, the treasurer of the Cincinnati Company, to Cincinnati, and received all his money from him, and for two of the months while the road was being built there was paid out over $50,000 per month for construction expenses.

Being questioned on cross-examination, Smith declined to answer the question propounded to him by appellee's counsel, whether the Cincinnati Road and the Kankakee & Seneca Road did not have a contract by which the former was to furnish money to build it. All their engineers seemed to be under

the control of Smith. Bonfield appeared to be a mere figure-head—a mere nominal president of the road. It is true all the construction accounts were kept in the name of the Kankakee & Seneca Road and it was charged with cars, etc., but this does not necessarily prove that the Cincinnati Company was not controlling the building of the road. The accounts might have been kept, for many reasons, consistent with the fact that the Cincinnati Company was directing the work through its agents. In fact, while Kelley was ostensibly in the employ of the Kankakee & Seneca Company, superintending in part its construction and keeping his accounts with it, he built certain dams across the railroad ditch on Horan's land at the trestle work on the west side of the east line, of stone, brush and dirt. The purpose was to prevent the water from running down on appellee's land from the Whitamore and Parker sloughs. This was done in the last of April or first of May, 1882, as he swears, at an expense of $75 or $100, and on the request of Owen Horan, and with the agreement that the latter would take care of the water when it passed through the trestle work to the north side, and rebate all damages, which agreement, however, is denied by Horan.

By a reading of this evidence it would seem that three dams were put in by the Kankakee & Seneca Company, but by turning to the bill read in evidence, filed by the Cincinnati Company in the United States Circuit Court of the Northern District of Illinois, in January, 1885, seeking to enjoin this suit and the Owen Horan suit on account of the putting in of those dams, and the alleged compromise with Owen Horan and appellee, we find that the Cincinnati Company was at that time operating the road, and made the agreement with appellee to put in the dams, and he was to dig a ditch north and "release the complainant, the Cincinnati Company and the Kankakee & Seneca Railroad Company, from said water in said ditches;" and the complainant, in that suit, it is averred in the bill, "*constructed such dams and embankments across said railroad ditches*," etc.

Here it is admitted by this bill, under oath, that the Cincinnati Company had complete control of this road from the time

sworn to by Kelley, to be from last April or first May, 1882, and the road at that time had scarcely, if at all, been completed. Taking all the circumstances together, we think there was evidence tending strongly to prove that the Cincinnati Company was the original projector of the road, and that in fact that it was the real party that furnished the money and built it. With circumstances like these proven against appellants, it was their duty to have relieved themselves from its effect by introducing evidence peculiarly within their own possession to prove the contrary if they had nothing to do with building the road and could have shown the true state of facts, which it refused to do. All instructions asked for by appellants, and refused by the court, going to disparage such circumstantial evidence and other of like nature, or instructing that a particular fact of itself was insufficient to prove the participation of the Cincinnati Company in building the road, or that the above named injunction bill did not tend to prove such fact, were each and all of them properly refused. It would have been gross error to have given them. The bill in connection with Kelley's evidence shows a definite period at which the Cincinnati Company assumed actual control of the road, to wit, the time the dams were constructed by Kelley. Without the bill it could not be clearly determined, and the bill also shows that it was operating the road under a contract with the Kankakee & Seneca Railroad Company.

As to the damages, it may be said that if the whole period of the three years be taken together, the evidence tends largely to show that the amount would have been much larger than $700; it would have been nearer $1,500. If we take the two last years, 1882 and 1883, the evidence tends to show that after May 1st, the time the Cincinnati Company had control of the road, the damages were some $900.

But it is claimed that the seasons were so rainy that these damages would have accrued without participation in or by the railroad embankment and ditches, and that there is no sufficient proof to show that the Cincinnati Company was responsible for the first year's damages, i. e., 1881. It is evident the

jury gave the appellants the benefit of the one or the other of these claims, and only allowed $700 damages against them.

Which of these considerations influenced the jury we are unable to say, but if it was justified under either, the verdict ought to stand. We think, without deciding as to the sufficiency of the evidence to sustain the claim for damages for 1881, that, as to the amount, the evidence sustains the verdict for the years 1882 and 1883, and much more if the damages for 1881 be included.

As to whether the appellant's railroad embankment and ditches were the cause of the damages, in whole or in part, was a question for the jury. The evidence on this point was somewhat conflicting, but on the whole we think the jury was justified in finding according to appellee's contention, that the appellants were responsible for and chargeable with the damages. We will not undertake to quote or comment on the evidence at length, as it would occupy too much time. But we will notice the evidence of one of the appellants' witnesses, who was a farmer living near, and who appears to be fair, intelligent and disinterested. It is S. E. Hartly. He says: "I think the flow of water on Horan's farm has been increased by the construction of the railroad, because the water can't get through there; what gets down the south side of the track can't get through, and of course that backs it up. The railroad and its embankments causes the water to stand on Horan's land in his corn field south of the railroad longer than it otherwise would. I saw the water in his corn fields three feet deep. Don't think I saw any corn fields in 1883 with so much water on them as there was on Horan's. Don't think the water north of the railroad as deep as it was south. Never was on Horan's farm very much, but I think it is on an average with farms east and west of it." This evidence seems to be fair, and based on substantial reasons, and given in by a witness indorsed by appellants themselves by introducing him as a witness. Much more of the same kind of evidence was introduced on the part of the appellee.

It is true that expert witnesses testified that the openings under the railroad were amply sufficient to allow of the free

passage of all the water from the sloughs, but when high waters and much rain came, the actual test showed whether those opinions were correct or not, and such was the character of the testimony of Hartly. If the jury believed that the railroad bank, and deep ditches in part, and the excessive rains in part, were the cause of the loss of appellee's crops, it was a question further to settle how much of it was chargeable to one and how much to the other, and that would be a most difficult question.

Their verdict should not be disturbed even if, in the opinion of the court, it had not adjusted the loss with exactitude. Their verdict, in order to justify us in setting it aside as being contrary to the weight of the evidence, should be manifestly erroneous, which we can not say is the case here.

The appellants make a large number of specific objections to divers of the rulings of the court on the trial, which we will now proceed to notice, or such of them as we deem of any importance. It is objected that the court allowed appellee to estimate the damages to thirty acres of corn on account of water, he answering that it was $4. It is contended that the witness should have stated what the elements were that made up such damages. The objection is not well taken even if the mode of proving was erroneous, for the appellants could have ascertained what the elements were that made up such damages by cross-examination, and if not satisfactory, have asked that the evidence be ruled out as to erroneous elements, besides other witnesses testified to the same thing and gave the data. The other objections up to the seventh are not well taken. The seventh objection to the admission of the above bill in equity, filed by the Cincinnati Company, is not well taken for reasons already given, nor the objections of the court refusing appellants to show that appellee could have mitigated the evil of the overflow by digging a drain north from the railroad bank to Parker's slough.

The appellee was a mere tenant and had no right to dig such a ditch, and was not compelled to do so. The proof was full in regard to the agreement to put in the dams spoken of, but the jury found for appellee on that point, and the proof was

fully admitted, as to show the overflow of the land prior to 1881, and the exclusion of a question or two, would not be sufficient ground of reversal.

The rejection of the questions in regard to whom the use of cars on the Kankakee & Seneca road was charged, and what accounts were kept, etc., is next to be noticed. This was calling for the contents of account books and was improper, and besides the evidence was quite full on this point, as admitted. The various instructions bearing on the duty of a railroad company to so build and construct its road as to not cause damage by casting water on adjacent lands and thereby damage them, were properly given, and the converse properly refused. The law in that particular is well settled and expressed in J., N. W. & S. E. R. R. v. Cox, 91 Ill. 500, and need not here be repeated. A case under the rule laid down in that case would be hard to imagine, where a railroad would be excused from liability for flooding of adjoining lands.

The instruction that damages already done in summer to growing corn could not be affected by frosts, rains, wet seasons and cold spells occurring later, was correct and in accordance with the opinion heretofore filed in this case on a former appeal.

The appellee, as tenant, was entitled to recover for the entire damages, and besides the proof showed that he was to have all of the crops.

The eleventh instruction in regard to the expert evidence given for appellee, in which the jury is told that they are to receive it with great scrutiny and caution, and does not require them to receive it as absolute truth, but charges them to give it such weight as they may find it entitled to when considered together with all the other evidence and circumstances in the case, was erroneously given as being in violation of the rule that part of the evidence should not be singled out in a case by the court, and given special prominence and the jury's attention especially called to it.

It has a tendency to disparage it as compared with the other evidence. The jury are the judges of the weight to be given to the different kinds of evidence, and the court should not even

seemingly make any distinctions.    What was said in regard to
this evidence in the instruction in question, might be said as to
all the evidence, and if the instruction had applied to all it
would have been unobjectionable.    But errors like this will
not always be good grounds for reversal, and we think that the
judgment in this case should not be reversed for this error, as
the record is otherwise free from error, and the case not close
on the point upon which the expert evidence bore.    We ad-
here to what was said in the Owen Horan case [22 Ill. App.
145,] in regard to there being no evidence in the case tending
to show that there was any extraordinary and unexpected floods
such as would entitle them to be called acts of Providence.

The rains were those commonly coming in very rainy seasons,
and therefore are to be expected, and must be provided against.
Hence the amendment by the court of the appellants' nineteenth
instruction was not error; neither was the refusal to give instruc-
tions for appellants on the same point.    From what has been
said, it will be seen that the court did not err in refusing to give
appellants' refused instructions, not one of which was proper
or pertinent under the evidence, and we will not notice them in
detail.

It was not error to receive the verdict on the Sabbath day
nor was the mention of the amount of the *ad damnum* in the
declaration in the instruction complained of, calculated to mis-
lead the jury.

The measure of damages was settled by this court when the
case was here before and we will not notice that question
further.

It is difficult for us to see how a fairer  trial on the  whole
could have been had than there was in this case, and the jury
having  settled the facts on competent and sufficient evidence
and  assessed  the damages in a reasonable sum  we do not feel
authorized to disturb the verdict.

The judgment of the court below is therefore affirmed.

*Judgment affirmed.*

*On motion to grant an appeal to the Supreme Court.*

*Per Curiam.*   We have carefully considered the matter of

the motion to grant an appeal, to the Supreme Court, and for a certificate of importance, the case not being appealable as a matter of right, and after due consideration feel constrained to deny it.

The main cause assigned for allowing an appeal is, that the court below refused to give instructions for the appellant to the effect that "if the railroad was well and properly constructed over the appellee's premises, and the damages complained of could not have been avoided by the exercise of reasonable care and skill," so far as related to the embankment over Horan's premises, no recovery could be had.

· We are of the opinion that this is not an open question in this State where the rule is applied to facts like those in this case.

The ·fact that a railroad company has procured the right of way, gives it no authority or right to so construct its road and embankments, as to flood the lands of the person over whose premises such right of way is granted. Reasonable care in constructing the road and embankments will not excuse it, if by its structures it causes the land to be overflowed more than it was before. The Supreme Court, in two cases, has expressly decided such to be the law. T., W. & W. R. R. Co. v. Morrison, 71 Ill. 616; J., N. W. & S. E. R. R. Co. v. Cox, 91 Ill. 500. Besides, the statute under which the appellant derives its charter, while speaking in reference to the five preceding grants of power in Sec. 20 of said act, in the proviso to the 5th clause thereof, enacts: "That in no case shall any railroad company construct a road-bed, without first constructing necessary culverts or sluices as the natural lay of the land requires for the necessary drainage thereof." It is imperative. There is no reference to the exercise of reasonable care. Not only this, the railroad is bound to keep and maintain their embankments and sluices in such a manner as not to overflow the land through which it runs. Decision in the case of the C., R. I. & P. Ry. Co. v. Smith, 111 Ill. 363, deciding that the damages caused by casting smoke, cinders, ashes and fire, and shaking the soil upon other parts of the lot, is covered by the grant of the right of way, in no wise changes the rule

announced in the other case, or the provisions of the statute.

The seventeenth instruction was clearly erroneous, because the railroad did not see to it that the water at the trestle work at Parker's slough did not turn and run west along the railroad ditch onto Horan's land. The large railroad ditch on the south side of the premises of Parker and Horan was the main course of the water running onto Horan's land, no matter who stopped the little ditch north of the trestle at Parker's slough. Besides, this little ditch turned the water coming through the trestle out of its natural course, onto Hawley's and Lutz's land, and it was partly on Lutz's land where the ditch was dug, and the railroad had no right to impose this burthen on them without compensation, and they had a right to insist on its being filled up. Believing that this case presents no questions, the importance of which on account of principal or collateral interests requires that they should be passed upon by the Supreme Court, the application is *denied.*